**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| INTERIOR LOGIC GROUP HOLDINGS IV, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ETHAN NEWELL,<br><br>Defendant. | Case No.:<br><br>Jury Demand |

**<u>VERIFIED COMPLAINT</u>**

Plaintiff Interior Logic Group Holdings IV, LLC ("Company" or "ILG") brings this action for permanent injunctive relief and monetary damages against Defendant Ethan Newell ("Newell").

ILG is the largest national provider of interior design solutions and installation of high-quality finishes for the building industry.

Newell is a former ILG VP, Cabinet Sales & Operations. Newell signed a separation agreement with ILG, which contained certain restrictive covenants, including non-disclosure and non-solicitation provisions. During his employment, Newell had access to some of ILG's most protected trade secrets and other confidential and proprietary information, including highly-sensitive information relating to ILG's customers.

Newell was terminated from ILG because his position was eliminated, effective September 19, 2025, and he then accepted a position with High Vision Construction

LLC ("High Vision"), a related entity to one of the Company's cabinet suppliers, Highland Cabinetry, Inc. - to serve as the VP Builder Sales. ILG learned of multiple examples where Newell solicited ILG customers in direct violation of his contractual obligations. After reminding Newell and High Vision of Newell's contractual obligations, Newell continued his unlawful solicitation.

In the short time since Newell began working for High Vision, ILG has already lost substantial revenue and fears further irreparable harm to its goodwill and market share will result from Newell's continued actions. ILG brings this action seeking to recover both monetary and injunctive relief relating to Newell's numerous breaches of his separation agreement and other unlawful conduct.

## PROCEDURAL AND JURISDICTIONAL FACTS

### *The Parties*

1. Plaintiff Interior Logic Group Holdings IV, LLC is a Delaware limited liability company with its principal place of business located at 15822 Bernardo Center Drive Ste 102 San Diego, California 92127.

2. Defendant Newell is an individual who resides in Bradenton, Florida and works for High Vision in Florida.

### *Jurisdiction and Venue*

3. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this dispute because ILG's claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, raise federal questions. ILG's state law claims fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because the claims

relate so closely to the federal questions that those claims form part of the same case or controversy.

4. Pursuant to 28 U.S.C. § 1332, this Court also has subject matter jurisdiction over this dispute because complete diversity exists between the parties and the amount in controversy exceeds $75,000.00.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and § 89(c) because a substantial part of the events or omissions giving rise to ILG's claims occurred in the Middle District of Florida.

## STATEMENT OF FACTS

### I. ILG'S LEGITIMATE BUSINESS INTERESTS AND PROTECTION OF ITS INFORMATION

6. Headquartered in San Diego, California, ILG is the largest national provider of interior design solutions and installation of high-quality finishes for the building industry, including single-family homes, multifamily homes, and more.

7. With more than 200 locations and over 80 design studios in the United States, ILG serves a vast array of customers, suppliers, and installers.

8. The interior design solutions and installation industry is highly competitive, and thus ILG's success in the industry depends largely on the relationships it has developed with its customers, suppliers, and installers.

9. ILG enjoys substantial relationships with its customers, suppliers, and installers due to the outstanding customer service it provides, due to the substantial time and expense cultivating its services, professional reputation, goodwill, and

business networks. In doing so, ILG has developed trade secrets and valuable confidential information, including without limitation, client lists and information, client and prospect contact information, carrier and other industry contacts, marketing plans and strategies, sales strategies and techniques, financial information and databases.

10. ILG takes significant measures to protect its legitimate business interests, confidential business information and trade secrets. These efforts include entering into restrictive covenant agreements with certain employees, including Defendant, that impose obligations regarding the preservation of ILG's confidential information and non-solicitation of ILG customers and ILG employees. Such measures are common and reasonable within ILG's industry.

11. To protect its confidential information, ILG actively takes measures including, but not limited to, ensuring that all business software, applications, and other cloud-based programs require unique log-in authentication, using encryption and other data protection technologies, and requiring all employees to undergo annual trainings relating to confidentiality policies and protocols promulgated by ILG. Employees are required to hold the company's confidential information in the strictest confidence. Employees of ILG have varying levels of access to proprietary information, applications and cloud-based programs, all of which is based on whether they have a legitimate business need to access that level of information.

12. ILG's confidential and proprietary information derives independent economic value from not being generally known to the public and not being readily

ascertainable by proper means and have been subject to efforts that are reasonable under the circumstances to maintain their secrecy.

13. The confidential and proprietary information described in the preceding paragraphs are ILG's trade secrets.

14. Much of the economic benefit to ILG from this information stems from its confidential nature, because if ILG's trade secrets were to become known to competitors, ILG would lose the competitive advantage afforded it by this information.

15. ILG spent substantial time, effort, money and resources in developing and maintaining its trade secrets.

## II. NEWELL'S EMPLOYMENT AND RESTRICTIVE COVENANTS WITH ILG

16. Newell worked for ILG as the VP, Cabinet Sales & Operations. In this role, Newell had access to ILG's trade secrets and other commercially sensitive business information, including Confidential Information.

17. Newell began working for ILG in December 2019. On or about September 19, 2025, Newell's position was eliminated and Newell entered the Separation Agreement & Release of Claims (**Ex. 1**, "SAR") with ILG.

18. As stated in the SAR, Newell agreed that,

> In consideration for Employee executing this Agreement, Employee shall receive a (i) total separation payment in the amount of $57,352.25 and (ii) a payment of $18,000.00 as part of a transition bonus, each subject to applicable federal and state tax withholding, as well as other deductions . . . .

*Id.* at p. 1.

19. Newell agreed that, in connection with the restrictive covenants in the SAR, his breach of the Agreement "would result in immediate and irreparable harm to the Company, its parents, subsidiaries, affiliates or related entities that cannot be adequately or reasonably compensated by law. Accordingly, Employee agrees that the Company shall be entitled, if any such breach shall occur or be threatened or attempted, if it so elects, to seek from a court a temporary, preliminary, and permanent injunction, without being required to post a bond, enjoining and restraining such breach or threatened or attempted breach by Employee." *Id.* at § 4.b.

20. Newell agreed that "[i]f any court determines that any provision of this Agreement is unenforceable because of the duration or scope of such provision, such provision shall not be rendered void, and such court shall have the power to amend the scope or duration of such provision, as the case may be, and, in its amended form, such provision shall remain in full force and effect." *Id.* at § 6.

21. The restrictions at issue and relevant here are the (a) Confidential Information and Trade Secrets provision (*id.* at § 4(a)-(c)) ("Confidentiality Provision"); and (b) Non-Solicitation provision (*id.* at § 5(a)-(b) ("Non-Solicitation Provision").

***Confidentiality Provision***

22. In the SAR, Newell acknowledged that "through Employee's employment with the Company, Employee has acquired and had access to the Company's Confidential Information" and "the Company's Trade Secrets." (*Id.* at pp.3-4.)

23. Based on the sensitive nature of the Company's confidential and proprietary information and trade secrets, Newell agreed as follows:

> 4. Confidential Information and Trade Secret. Employee agrees that, for a period of three years after the Effective Date, Employee will hold in confidence all Confidential Information of the Company and will not disclose, publish or make use of such Confidential Information . . . . "Confidential Information" shall include any data or information, other than trade secrets, that is valuable to the Company and not generally known to competitors of the Company or other outsiders, regardless of whether the confidential information is in printed, written, or electronic form, retained in Employee's memory, or has been compiled or created by Employee. This includes, but is not limited to: technical, financial (excluding wages), credit marketing, payroll, computer systems, marketing, advertising, merchandising, operations, strategic planning, product, vendor, customer or store planning data, trade secrets, or other information similar to the foregoing.
>
> a. Employee further acknowledges that the Company has made reasonable efforts under the circumstances to maintain the secrecy of its Trade Secrets. Employee agrees to hold in confidence all Trade Secrets of the Company that came into Employee's knowledge during employment by the Company and shall not disclose, publish, or make use of at any time such Trade Secrets for so long as the information remains a Trade Secret. "Trade Secret" means information, without regard to form, including, but not limited to, any technical or non-technical data, formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plans, strategic plans, product plans, or list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can derive economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* at § 4.a.

***Non-Solicitation Provision***

24. Through the SAR, Newell agreed to the following restriction on competition:

> 5. Non-Solicitation
>
> a. Employee agrees that for a period of one year following the Termination Date, Employee will not directly or indirectly (i.e. direct action coordinated by Employees through the use of a third-party or resource) solicit or attempt to solicit any business that directly competes with the business of the Company existing as of the Termination Date from any of the Company's customers or suppliers with whom Employee had material business contact or about whom Employee received Confidential Information during the one-year period prior to Employee's Termination Date.
>
> b. Employee agrees that for a period of one year following the Termination Date, Employee will not directly or indirectly solicit any person who is an employee of the Company to terminate his or her relationship with the Company without prior written approval from the Legal Department of the Company.

*Id.* at § 5.a.-b.

25. Despite agreeing to the three-year non-disclosure and one-year non-solicitation in the SAR, Newell immediately began breaching his duties thereunder, by using unfair methods or misappropriated information to compete with ILG, and soliciting ILG customers.

## III. NEWELL'S VIOLATIONS OF HIS AGREEMENT WITH ILG

26. The Company recently learned that Newell accepted a position with High Vision as its VP Builder Sales based in Florida.

27. Upon information and belief Newell's job duties for High Vision are the same or similar to the job duties Newell performed as the VP, Cabinet Sales & Operations for ILG.

28. In this role with High Vision, Newell has unlawfully solicited several ILG customers with whom he developed relationships while at ILG. These customers include but are not limited to Century Communities, Simply Dwell Homes, Meritage Homes, and Pulte Homes.

29. As soon as practicable after learning that Newell had accepted a position with High Vision, ILG sent a cease-and-desist letter to Newell reminding him of his obligations under the SAR and detailing his clear violations of the SAR. (**Ex. 2**, March 9, 2026, Cease and Desist to Newell.)

30. ILG's cease-and-desist letter further reminded Newell of his remaining obligations under the terms of the SAR. (*Id.*)

31. Newell has still not confirmed, in writing, that he is complying with the restrictions set forth in his SAR. Instead, Newell's counsel sent a response letter to ILG tacitly confirming that: (a) Newell was aware that Newell signed the SAR; and (b) that Newell is continuing to violate the SAR. (**Ex. 3**, April 9, 2026, Response Letter from Newell's Counsel.)

32. Upon information and belief, Newell is violating and will continue to violate the restrictive covenants contained in his SAR.

33. Upon information and belief, Newell is using, and will continue to use, ILG's Confidential Information to unfairly and unlawfully compete with ILG.

## IV. ILG IS HARMED BY NEWELL'S BREACHES OF CONTRACT AND TORTIOUS CONDUCT

34. Since Newell began with High Vision, ILG has experienced several lost opportunities with customers for which Newell serviced during his time with ILG.

35. ILG has lost substantial revenue which losses ILG alleges, upon information and belief, are attributable directly to Newell's ongoing breaches under the SAR and/or other unlawful conduct and the costs of mitigation.

36. Upon information and belief, Newell, in concert with High Vision, intends to emulate ILG's business model by, among other things, using ILG's Confidential Information to unlawfully compete with it.

37. Upon information and belief, ILG alleges that Newell played, and continues to play, a direct role in soliciting ILG's current and/or former customers to abandon their business relationship with ILG and to enter into a similar business relationship with High Vision—in direct violation of his obligations under the SAR.

38. ILG alleges, upon information and belief, that Newell's actions have adversely impacted and will continue to adversely impact the Company's goodwill and profits.

39. The Company further contends, upon information and belief, that with respect to Newell's unlawful conduct, Newell acted specifically in the interest of, and with the knowledge and support of, High Vision.

## V. ILG's Entitlement to Injunctive Relief

40. ILG has clearly ascertainable rights in need of protecting including to: (a) preserve and maintain the integrity of its Confidential Information together with the goodwill and market share it expended significant time and resources to create; and (b) prevent Newell from violating the bargained-for provisions contained in his SAR.

41. The SAR is a valid and enforceable contract that prohibits Newell from, among other things: (a) soliciting ILG's employees for one year following his separation of employment; (b) soliciting ILG's customers for one year following his separation of employment; and/or (c) disclosing or otherwise using ILG's Confidential Information.

42. ILG fully performed its obligations under the SAR.

43. Newell has engaged in and is continuing to engage in conduct that constitutes a material breach of numerous provisions in the SAR and is otherwise unlawful.

44. ILG has suffered and will continue to suffer irreparable harm and economic damages as a result of Newell's unlawful conduct. Moreover, ILG has an urgent need to protect its legitimate business interests.

45. There is no adequate remedy at law that might address the irreparable injury caused by Newell's actions. Absent relief, ILG will continue to lose market share to High Vision, directly or indirectly as a result of Newell's actions. There is no way to accurately forecast the effect on ILG's business over time, or the extent of the long-term damages due to Newell's actions.

46. ILG is likely to prevail on the merits in this action. Should ILG be required to wait until a full trial on the merits to enforce its legal rights, however, it will be irreparably harmed because it will continue to lose business, goodwill, and customers that may never be recovered.

47. Injunctive relief is not contrary to the public health, safety, or welfare. Moreover, issuing injunctive relief will serve the public interest and the harm to ILG absent the requested relief strongly outweighs the risk of harm to Newell should injunctive relief be granted.

48. ILG has been required to retain the law firm of Ogletree Deakins to represent it in this action and have been obligated to pay the firm a reasonable fee for its services.

## CAUSES OF ACTION

### Count I – Breach of Contract

49. ILG hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-48 above as if fully set forth herein.

50. The contractual provisions below, contained in the SAR, are valid and enforceable contractual obligations between Newell and ILG.

51. Newell received valuable consideration for the restrictive covenants.

52. As described in more detail both above and below, Newell breached these contractual provisions.

53. ILG further alleges, upon information and belief, that Newell intends to further breach those provisions in the future.

54. By breaching these valid and enforceable contractual provisions in the SAR, Newell has caused damages to ILG in an amount that is currently unknown but which will be calculated in discovery and before trial.

55. ILG has suffered and will continue to suffer damages and irreparable harm as a result of Newell's actions.

***Non-Disclosure Provision***

56. The Company alleges, upon information and belief, that Newell has used, is using, and will continue to use ILG's Confidential Information for his own benefit and/or for the benefit of High Vision.

57. ILG has suffered and will continue to suffer damages and irreparable harm as a result of Newell's actions.

***Non-Solicitation Provision***

58. Section 5(a) of the SAR provides that, "[u]nless otherwise prohibited and only to the greatest extent enforceable by state and/or local law," for "a period of one year following the Termination Date," Newell "will not directly or indirectly . . . solicit or attempt to solicit any business that directly competes with the business of the Company existing as of the Termination Date from any of the Company's customers or suppliers with whom Employee had material business contact or about whom Employee received Confidential Information during the one-year period prior to Employee's Termination Date." (*Id.* at § 5.a.)

59. The restricted period began on the September 19, 2025 Termination Date and, absent tolling, would have ended on September 19, 2026. Newell's position was

eliminated effective September 19, 2025, and he began working for High Vision the very next month. On January 12, 2026, during the restricted period, Newell sent an email directly soliciting ILG's customer Century Communities, in breach of Section 5(a) of the SAR. Upon information and belief, Newell has continued to solicit ILG customers for High Vision since that date, including Century Communities, Simply Dwell Homes, Meritage Homes, and Pulte Homes. Because Newell breached the Non-Solicitation Provision during the restricted period and has continued to breach it, ILG has not received the full benefit of the protection for which it bargained. ILG therefore asks the Court to toll the restricted period equitably from January 12, 2026, the date of Newell's first breach, until Newell comes into compliance, so that ILG receives the unexpired balance of the one-year period. *See also id.* at § 6 (recognizing the Court's power to amend the duration of a restrictive provision).

60. ILG alleges, upon information and belief, that Newell has violated—and will continue to violate—the Non-Solicitation Provision in connection with his work for High Vision.

61. ILG has suffered and will continue to suffer damages and irreparable harm as a result of Newell's actions.

**Count II – Violations of the DTSA, 18 U.S.C. § 1836 *et seq.***

62. ILG hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-48 above as if fully set forth herein.

63. While employed by ILG, Newell had access to the Company's Confidential Information, including customer and supplier information, pricing and

business strategy information, sales strategies and techniques, marketing strategies and information, and other financial information, among other things discussed above.

64. ILG expended substantial time, effort, money, and resources in acquiring, developing and maintaining its Confidential Information.

65. ILG takes reasonable, affirmative measures to maintain the confidentiality of this information for ILG's exclusive benefit and competitive advantage in the industry.

66. ILG's Confidential Information constitutes ILG's trade secrets for purposes of the Defend Trade Secrets Act.

67. Newell had, and has, a duty not to use or disclose ILG's Confidential Information for his own benefit or for that of a competitor.

68. Upon information and belief, Newell has wrongfully retained ILG's Confidential Information and is using and/or disclosing such information for his benefit and that of High Vision.

69. Newell's actions were and continue to be, upon information and belief, willful and malicious.

70. As a direct and proximate result of Newell's misappropriation of ILG's Confidential Information, ILG has suffered, and will continue to suffer, irreparable harm and economic damages.

**<u>Count III – Violations of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 *et seq.*</u>**

71. ILG hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-48 above as if fully set forth herein.

72. While employed by ILG, Newell had access to the Company's Confidential Information, including customer and supplier information, pricing and business strategy information, sales strategies and techniques, marketing strategies and information, and other financial information, among other things discussed above.

73. ILG expended substantial time, effort, money, and resources in acquiring, developing and maintaining its Confidential Information.

74. ILG takes reasonable, affirmative measures to maintain the confidentiality of this information for ILG's exclusive benefit and competitive advantage in the industry.

75. ILG's Confidential Information constitutes ILG's trade secrets for purposes of the Florida Uniform Trade Secrets Act.

76. Newell had, and has, a duty not to use or disclose ILG's Confidential Information for his own benefit or for that of a competitor.

77. Upon information and belief, Newell has wrongfully retained ILG's Confidential Information and is using and/or disclosing such information for his benefit and that of High Vision.

78. Newell's actions were and continue to be, upon information and belief, willful and malicious.

79. As a direct and proximate result of Newell's misappropriation of ILG's Trade Secrets, ILG has suffered, and will continue to suffer, irreparable harm and economic damages.

**Count IV – Tortious Interference with ILG's Advantageous Business Relationships**

80. ILG hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-48 above as if fully set forth herein.

81. ILG has advantageous business relationships with its customers and suppliers.

82. The Company's customer and supplier base and customer and supplier relationships have been developed by it over an extensive period of time and at great expense.

83. ILG has a reasonable expectancy of maintaining and entering into valid business relationships with their customers and suppliers.

84. Newell knew or should have known that customer and supplier relationships are crucial to ILG.

85. Upon information and belief, Newell intentionally and unjustifiably interfered—and continues to interfere—with ILG's advantageous business relationships with its customers and suppliers.

86. Upon information and belief, by improper means, and without authorization from ILG, Newell unlawfully retained the Company's Confidential Information which he has used in order to solicit ILG's customers suppliers to divert

business from ILG to High Vision, and to otherwise engage in unfair and unlawful competition.

87. Newell's interference is without justification or privilege and has prevented—and continues to prevent—ILG from realizing its business expectancy.

88. Upon information and belief, ILG suffered and continues to suffer irreparable harm and economic damages (including lost sales, lost profits, loss of business opportunities, and loss of goodwill and competitive advantage) as the direct and proximate result of Newell's unlawful interference.

## Request for Relief

ILG respectfully requests that this Court enter judgment for the Company and against Newell as follows:

A. Permanently enjoining Newell, and all persons in active concert or participation with him who receive actual notice of the Court's order, from directly or indirectly soliciting or attempting to solicit any business that directly competes with the business of ILG from any ILG customer or supplier with whom Newell had material business contact, or about whom Newell received Confidential Information, during the one-year period before September 19, 2025, including Century Communities, Simply Dwell Homes, Meritage Homes, and Pulte Homes, for the unexpired balance of the one-year restricted period under Section 5(a) of the SAR, equitably tolled from January 12, 2026, the date of Newell's first breach, and running

from the date of the Court's order or the date Newell comes into compliance, whichever is later;

B. Permanently enjoining Newell from acquiring, accessing, using, disclosing, or misappropriating the Company's Confidential Information and award ILG all damages to which it may recover under applicable law cause as the direct and proximate result of Newell's conduct, including recovery of its attorneys' fees;

C. Ordering Newell to immediately return to ILG any and all of its electronic and hardcopy Trade Secrets and/or Confidential Information and to take all steps necessary to effectuate a forensic examination of any and all devices capable of performing computing functions or storing electronic information that are owned by, have been used by, or been accessible to Newell at any time since the date six months prior to the date on which his employment with ILG terminated for the purpose of determining how he has accessed, used, disclosed, or misappropriated the Company's Trade Secrets and/or Confidential Information;

D. Granting ILG access to any and all personal accounts used for communication purposes by Newell so that ILG may determine the extent to which Newell (1) retained, used, or disclosed any of the Trade Secrets and/or Company's Confidential Information, and/or (2) took other actions toward violating his obligations under the SAR;

E. Granting the Company access to any and all electronic devices owned, used or accessed by Newell for the purpose of determining if such devices contain copies of ILG's Confidential Information, and permitting ILG to take any other

appropriate and reasonable steps to recover its Trade Secrets and/or Confidential Information and to ensure none of ILG's Trade Secrets and/or Confidential Information were distributed or preserved by Newell in any form;

F. Restraining Newell from in any way divulging, disseminating, or utilizing ILG's Trade Secrets and/or Confidential Information in the interim; and

G. Entering judgment against Newell, and award ILG all damages available under applicable law together with prejudgment and post-judgment interest, costs, attorneys' fees and such other and further relief, at law or in equity, as the Court deems just.

Dated: October 22, 2026

Respectfully submitted,

*/s/Ignacio J. Garcia*
Ignacio J. Garcia
Florida Bar No. 423440
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
100 North Tampa Street, Suite 3600
Tampa, FL 33602
Telephone: (813) 289-1247
Facsimile: (813) 289-6530
iggy.garcia@ogletree.com
karen.ygnelzi@ogletree.com
TAMdocketing@ogletree.com

***ATTORNEY FOR PLAINTIFF***

**VERIFICATION**

Under penalties as provided by law pursuant to 28 U.S.C. § 1746, I, Jeff Trapp, with ILG, hereby verify that I have reviewed subsections I-V of the Complaint and the exhibits cited in those subsections. The Separation Agreement & Release of Claims signed by Newell is a business record regularly maintained in the course of ILG's business. Further, the facts alleged in subsections I-V are true and correct based on my personal knowledge, my review of the exhibits, and based upon my status as a ILG corporate representative in this matter.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on October 22, 2026

Signed by:
Jeff Trapp
144217BEEBC34AE...

Jeff Trapp